UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LEISA EPPS, | ) |
| | ) |
|    Plaintiff, | ) No. 3:14-cv-01411 |
| | ) Judge Haynes |
| v. | ) Magistrate Judge Brown |
| | ) **Jury Demand** |
| VANDERBILT UNIVERSITY, | ) |
| | ) |
|    Defendant. | ) |

To: The Honorable William J. Haynes, Jr., Senior United States District Judge

### Report and Recommendation

Pending before the Court is the Defendant's Motion for Summary Judgment. (Docket Entry 67). For the following reasons, the Magistrate Judge **RECOMMENDS** that the Defendant's Motion for Summary Judgment be **GRANTED IN PART and DENIED IN PART**. The Defendant's Motion for Summary Judgment should be **GRANTED** as to the Plaintiff's claims of age discrimination and disability discrimination. The Defendant's Motion for Summary Judgment should be **DENIED** as to the Plaintiff's claim of FMLA retaliation and the Plaintiff's demand for back pay and front pay.

### I. Factual Background

The Plaintiff began working at the Vanderbilt University Medical Center ("VUMC") in 2003 when she was forty-two years old. (Docket Entry 79 ¶ 1-2). After leaving and rejoining VUMC several times, the Plaintiff was promoted to RN III in the Perioperative Services Department of VUMC in 2007. (Docket Entry 79 ¶ 2, 4).

While the Plaintiff worked for VUMC, two systems were used to address employee behavior: Performance Accountability ("PAC") and Performance Improvement Counseling

1

("PIC"). (Docket Entry 86, p. 23). PAC was a coaching tool, not an appealable disciplinary decision. (Docket Entry 86, p. 23). PIC was a disciplinary action and was appealable. (Docket Entry 86, p. 23).

From 2012 to the time the Plaintiff was terminated in 2013, Rachael Poff was the Plaintiff's direct supervisor. (Docket Entry 79 ¶ 5). Ms. Poff was aware that the Plaintiff was on intermittent FMLA for twenty days between October 2012 and October 2013 and eighteen days of continuous FMLA from January 2013 to February 2013. (Docket Entry 86, p. 17).

The Plaintiff received a PAC after the following incident on May 30, 2012. One of the Plaintiff's patients was having trouble breathing. In search of a necessary tool, the Plaintiff raised her voice, stating "I need a bronch." (Docket Entry 79 ¶ 15) (Docket Entry 86, p. 18). Two other women present, Dalphine Gilcrease and Debbie Dobbs, were in the room. (Docket Entry 79 ¶ 15). Ms. Dobbs helped the Plaintiff obtain a bronchoscope. (Docket Entry 86, p. 4). Ms. Gilcrease pursued the Plaintiff, asking the Plaintiff about a harmonic scalpel that the Plaintiff had asked about days earlier. (Docket Entry 86, p. 4). Trying to get back to her patient, the Plaintiff said "Fuck you" to Ms. Gilcrease and left. (Docket Entry 86, p. 4). Ms. Gilcrease and Ms. Dobbs' supervisor, Tanya Stellges, filed a second-hand report of the incident on Vanderbilt's VERITAS confidential internal reporting system. (Docket Entry 79 ¶ 18). The Plaintiff refused to sign the written warning regarding the incident, disputing several parts of the document. (Docket Entry 79 ¶ 20). The Plaintiff filed a report regarding Ms. Gilcrease's conduct on VERITAS and reported the incident to her managers on May 30, 2012. (Docket Entry 86, p. 20). Ms. Poff was not aware if Ms. Gilcrease was disciplined for her conduct because Ms. Poff is not Ms. Gilcrease's manager. (Docket Entry 86, p. 21). Nurse Fairchild, an expert hired by VUMC, opined that the Plaintiff's profane statement was inappropriate. (Docket Entry 86, p. 5). VUMC's

policy of professional conduct contains expectations that employees will act professionally and treat others with respect. (Docket Entry 86, p. 1-2). Shortly after the incident, the Plaintiff took FMLA on June 6 and 8, 2012. (Docket Entry 86, p. 18). Ms. Poff issued the Plaintiff a PAC for unprofessional conduct on June 22, 2012. (Docket Entry 79 ¶ 14) (Docket Entry 86, p. 24).

Later that year, Ms. Poff issued the Plaintiff a Final Warning on November 16, 2012, for sending a soiled patient out of the operating room. (Docket Entry 86, p. 6). The patient had been handed off to the Plaintiff at the end of an operation. (Docket Entry 86, p. 6). While moving the patient, the Plaintiff noticed that the patient had soiled herself. (Docket Entry 86, p. 6). Cleaning patients was one of the Plaintiff's duties. (Docket Entry 79 ¶ 23). The Plaintiff sent the soiled patient to "PACU (recovery)" in order to timely meet with a physician for a meeting and, according to the Plaintiff, because no clean linens were available. (Docket Entry 86, p. 6). Although Ms. Poff recalled that a change in linen delivery times made linen scarce, she also stated that items other than linen could be used to clean a patient. (Docket Entry 86, p. 22). The Plaintiff disagrees with Nurse Fairchild's opinion that the Plaintiff's conduct failed to meet the applicable professional standards of care. (Docket Entry 86, p. 9).

Beginning in 2013, VUMC took a closer look at the performance of its employees. (Docket Entry 86, p. 10). VUMC terminated 193 employees in July 2013 based on the following criteria: (1) active discipline within the past year or (2) poor performance evaluation scores. (Docket Entry 86, p. 10-11). An employee's disciplinary record was based on the disciplinary documents in the human resources database. (Docket Entry 86, p. 26). The Plaintiff was not on the initial termination lists. (Docket Entry 86, p. 26). She was still not identified for termination on June 23, 2013. (Docket Entry 86, p. 26). On June 24, 2013, Deborah Grant, the executive director of VUMC's human resources office, emailed Joanna Echols, a human resources

3

representative, and Jannis Muscato, the human resources director for VUMC, "How many are currently out on FMLA leave?" (Docket Entry 78-8, p. 2). Several hours after that email was sent, Ms. Echols emailed an updated termination list to Ms. Muscato and Ms. Grant, this time adding the Plaintiff to the list. (Docket Entry 78-9, p. 3) (Docket Entry 86, p. 27).[1] The Plaintiff was terminated on July 1, 2013, allegedly on account of the November 16, 2012 Final Warning and for being a "low performer." (Docket Entry 79 ¶ 31) (Docket Entry 86, p. 11).

Generally, between six and twenty nurses in training are accepted by the Perioperative Department each January and July. (Docket Entry 86, p. 15). The Perioperative Department has hired RN Is and RN IIs since the Plaintiff's termination. (Docket Entry 86, p. 15). The nurses hired after January 2013 were ages 22, 23, 23, 24, 25, 25, 41, and 50. (Docket Entry 86, p. 16). To date, no RN IIIs have filled the Plaintiff's position. (Docket Entry 79 ¶ 34).

The Plaintiff testified that during her last year of employment, she experienced various health problems. (Docket Entry 79 ¶ 35). While the Plaintiff claims disabilities arising from chronic urinary tract infections, fibromyalgia, chronic back pain, lower left extremity pain, pain in her right shoulder and hand, migraine headaches, and hearing problems, she did not hear discriminatory statements from supervisors or coworkers. (Docket Entry 79 ¶ 35) (Docket Entry 86, p. 12). She did not pursue a formal request for work accommodation. (Docket Entry 86, p. 12). Although the Plaintiff states that she was not informed of her right to request an accommodation, she annually certified that she reviewed Vanderbilt's equal employment opportunity and affirmative action and anti-harassment policies which explain which office should be contacted for accommodations. (Docket Entry 86, p. 18).

Five months before she was terminated, the Plaintiff filed for Social Security Disability Insurance ("SSDI") benefits, declaring that she could not work because of her disabling

---

[1] The spreadsheet submitted to substantiate this fact is illegible. (Docket Entry 78-9, p. 3)

conditions effective January 23, 2013. (Docket Entry 79 ¶ 38). She did not follow through with the application. (Docket Entry 77-1, p. 29). In January 2014, the Plaintiff reapplied for SSDI benefits. (Docket Entry 86, p. 13-14). This application was denied. (Docket Entry 77-3, p. 3-4). The Plaintiff has not been employed since her termination from VUMC in 2013. (Docket Entry 79 ¶ 40).

## II. Procedural History

This lawsuit is brought under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") as amended by the ADA Amendments Act of 2008 ("ADAAA"), and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103 ("TDA"). (Docket Entry 18 ¶ 1).

The Plaintiff alleged that the Defendant disciplined her more harshly and ultimately terminated her on account of her age, her disability, and in retaliation for her use of FMLA leave. (Docket Entry 18, p. 1). The case was referred to the Magistrate Judge for a Report and Recommendation on dispositive motions. (Docket Entry 19).

On November 19, 2015, the Defendant filed a Motion for Summary Judgment, seeking dismissal of the entire action. (Docket Entry 67). The Plaintiff responded on December 18, 2015. (Docket Entry 80). On January 6, 2016, the Defendant replied. (Docket Entry 87). The matter is properly before the Court.

## III. Standard of Review

Summary judgment is awarded when the movant has established that no material facts are genuinely in dispute and that, as a matter of law, the movant is entitled to a favorable

judgment. Fed. R. Civ. P. 56(a); *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Facts are genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To oppose a motion for summary judgment, the nonmovant "must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008) (citation omitted). The evidence is viewed in the light most favorable to the nonmovant, and all reasonable inferences are drawn in favor of the nonmovant. *Id.* "Summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012) (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008)).

## IV. Analysis

### A. Age Discrimination under the ADEA and the THRA

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Claims of age discrimination brought under the THRA are analyzed in the same manner as claims brought under the ADEA. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006)). Where, as here, the employee has only submitted circumstantial evidence of age discrimination, the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applied. *Bender*, 455 F.3d at 620. "Under this framework, the employee first

6

has the burden of proving a prima facie case of age discrimination; if [s]he is successful, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for taking the allegedly discriminatory action. Finally, the employee bears the burden of proving that the employer's justification is pretext for discrimination." *Pierson*, 749 F.3d at 536 (citation omitted). To establish a claim under the ADEA, the employee must show that her age was the "but-for" cause of adverse action complained of. *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

The prima facie case for age discrimination consists of four elements: (1) the employee was at least forty years old when (2) the employee suffered an adverse employment action; (3) the employee was qualified for the position; and (4) either the employee was replaced with a younger employee or similarly situated younger employees were treated more favorably. *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (citation omitted). The Sixth Circuit has explained that whether an employee is "similarly situated" in all relevant factors is a flexible standard and that the factors considered are unique to each case. *McMillan v. Castro*, 405 F.3d 405, 413-14 (6th Cir. 2005). Pertinent factors to be considered, however, may include whether the employees shared the same supervisor, whether the employees engaged in the same conduct, whether the standards applied to the employees differed, and whether the circumstances warranted different treatment of the employees. *Id.*

The Defendant challenges the fourth element of the prima facie case for age discrimination. (Docket Entry 69, p. 13). According to the Defendant, the Plaintiff's position has not been filled by a younger employee because only RN Is and RN IIs have subsequently been

7

hired, not RN IIIs. Additionally, the Defendant argues that the Plaintiff has not identified any similarly situated employees outside of the protected class that have been treated more favorably than the Plaintiff. In response, the Plaintiff contends that the newly hired RN Is and RN IIs, ages 22, 23, 23, 24, 25, 25, 41, and 50, could perform the Plaintiff's job and therefore establish the fourth element of the prima facie case. (Docket Entry 80, p. 24). According to the Plaintiff, "[i]t is simply not plausible a nurse is not performing Ms. Epps' former job duties given VU's growth." (Docket Entry 80, p. 23). The Defendant maintains that RN Is and RN IIs are not interchangeable with RN IIIs and notes that the Plaintiff has not presented evidence showing that the positions are interchangeable. (Docket Entry 87, p. 1).

A district court case from within this Circuit is persuasive. *See Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 828 F. Supp. 2d 889 (E.D. Ky. 2011) *aff'd,* 508 F. App'x 404 (6th Cir. 2012). In *Laws*, the plaintiff, a fifty-five year old licensed practical nurse ("LPN") alleged an ADEA violation when she was terminated. *Id.* at 908. Within a year of her termination, the employer hired a RN and a LPN who were both younger than the plaintiff. *Id.* at 908-09. Summary judgment was granted in favor of the employer because the plaintiff failed to submit "evidence showing that [the employer] tried to fill [the p]laintiff's vacant position or that the LPN or the RN worked the same 'shift' as [the p]laintiff." *Id.* at 909. Showing that younger people were hired after the plaintiff was fired was not sufficient; the plaintiff was required to "supply the link between their hiring and performance of her former duties." *Id.* The plaintiff did not appeal this ruling. Additionally, the plaintiff had not identified similarly situated younger employees who were treated more favorably than the plaintiff. *Id.* at 909-10. The two younger employees referenced by the plaintiff had not committed infractions similar to the plaintiff's misconduct. *Id.* at 910. On appeal, the Sixth Circuit addressed the "similarly situated" factor and

8

affirmed the District Court. *Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 411 (6th Cir. 2012).

The Plaintiff has not established a prima facie case of age discrimination under the ADEA and THRA. First, the Plaintiff has not met her burden of establishing that she was replaced by a younger employee. The RN III position she vacated is still unfilled, and very much like the issue in *Laws*, the Plaintiff has identified younger RN Is and RN IIs hired by the Defendant, but she has not put forth evidence to establish that these new employees are performing her former duties. The Plaintiff's supposition that the new hires must be performing the Plaintiff's former duties does not satisfy the Plaintiff's burden of production. Second, the Plaintiff has not met her burden of showing that similarly situated younger individuals were treated more favorably than she. The Plaintiff did not address this factor in her response to the Defendant's Motion for Summary Judgment. Moreover, the Plaintiff has not identified individuals who committed the same kind of conduct for which she was disciplined in June 2012, cursing at a fellow employee, and November 2012, sending a soiled patient from the operating room to another level of care. As was emphasized in *Laws*, whether another employee is "similarly situated" for purposes of this analysis is fact specific. For a meaningful comparison of disciplinary action taken against different employees, the employees must have committed similar infractions. Absent a showing of this similarity, the severity of the disciplinary actions does not carry much weight. The Plaintiff's claims under the ADEA and the THRA should be **DISMISSED**.

**B. Disability Discrimination under the ADA and the TDA**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

9

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims brought under the TDA are generally analyzed like claims brought under the ADA. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 n.2-3 (6th Cir. 2013) (noting that the TDA does not require reasonable accommodations); *Eren v. Mars, Inc.*, 27 F. Supp. 3d 855, 866 (M.D. Tenn. 2014). The employee must show that her disability was a "but-for" cause of the employer's adverse action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012). This may be accomplished through direct or indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004). When indirect evidence is submitted to establish discrimination on the basis of disability, the *McDonnell Douglas* burden-shifting framework applies. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

The plaintiff must establish the following to make a prima facie case of disability discrimination: (1) she is disabled; (2) she is qualified for the job with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer either knew or had reason to know of the plaintiff's disability; and (5) the plaintiff was replaced or her position was kept open and the employer sought to fill the position. *Id.* (citation omitted); *see also Parker v. Metro. Gov't of Nashville*, No. 3:14-CV-00959, 2016 WL 205380, at *2 (M.D. Tenn. Jan. 15, 2016).

The Defendant first argues that the Plaintiff is not qualified for the position because the Plaintiff filed for SSDI benefits five months before she was terminated. (Docket Entry 69, p. 16). Next, the Defendant argues that the Plaintiff has not been replaced and that the Defendant did not keep the Plaintiff's RN III position open while searching for a replacement. (Docket Entry 69, p. 17). In response, the Plaintiff argues that there is no conflict between the representations she

made in her SSDI application and in her ADA claim. (Docket Entry 80, p. 22). She additionally maintains that the recently hired RN Is and IIs replaced her as a RN III and that "[i]t is simply not plausible a nurse is not performing Ms. Epps' former job duties given VU's growth." (Docket Entry 80, p. 23). As with the age discrimination claim, the Defendant remarks that the Plaintiff has not submitted evidence to show that the RN I, II, and III positions are interchangeable. (Docket Entry 87, p. 1).

The Plaintiff's failure to produce evidence that she was replaced or that her position was held open while the Defendant sought her replacement is fatal to her claim of disability discrimination. To survive the Defendant's summary judgment motion, the Plaintiff was required to put forth sufficient evidence to establish this element for which she would bear the burden of proof at trial. *See Seeger*, 681 F.3d at 281. The parties agree that RN Is and IIs were hired after the Plaintiff's termination in July 2013, but the Plaintiff has not put forth evidence showing that the RN Is, IIs, and IIIs perform the same duties or that her position was held open while the Defendant sought to fill it. The Plaintiff's appeal to common sense, asserting that the new hires must be performing the Plaintiff's former duties, is not evidence. Even without addressing the issue of whether the Plaintiff is "qualified" for the position, the Plaintiff has not met her burden of establishing that she was replaced or that her position was held open while her replacement was sought. For this reason, the Plaintiff's claim of disability discrimination under the ADA and the TDA should be **DISMISSED**.

## C. FMLA Retaliation

Under the FLMA, eligible employees may take up to twelve weeks of leave within any twelve-month period for a variety of reasons. 29 U.S.C. § 2612(a)(1). It is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing

any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2); *see also* 29 C.F.R. § 825.220. FMLA retaliation claims based on circumstantial evidence are evaluated using the *McDonnell Douglas* burden-shifting framework. *Seeger*, 681 F.3d at 283 (citation omitted).

To make a prima facie case of FMLA retaliation, the Plaintiff must establish: (1) [s]he was engaged in a statutorily protected activity; (2) [the Defendant] knew that [s]he was exercising h[er] FMLA rights; (3) [s]he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Id.* (citation omitted). The causal connection may be established by close temporal proximity of the adverse employment action and when the employer learned of the protected FMLA activity. *Id.* (finding a causal connection when an employee was fired within three weeks of returning from FMLA leave and within two months of notifying his employer of his medical leave); *see also Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (a lapse of two months between the protected activity and the adverse employment action was sufficient to show a causal connection); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (three months between the plaintiff's request for FMLA leave and the plaintiff's termination satisfied causal element of the prima facie case). If the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Seeger*, 681 F.3d at 284. Once that is accomplished, the burden of production shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination. *Id.* at 285.

The Plaintiff claims that she was disciplined and eventually terminated for taking FMLA leave. (Docket Entry 18 ¶ 23-24). The Defendant argues that the Plaintiff cannot establish the causal element of the prima facie case and that the Plaintiff cannot establish pretext. (Docket

Entry 69, p. 18-19). The Plaintiff points to the following circumstantial evidence to establish her FMLA retaliation claim:

(1) Ms. Poff was aware Ms. Epps took FMLA when she disciplined Ms. Epps.

(2) Ms. Epps's June 2012 [discipline] came on the heels of her taking FMLA earlier that month.

(3) Profanity is regularly used in the OR and no other employee has been written up for use of profanity.

(4) Ms. Poff did not ask Ms. Epps or the attending physician what happened [during the encounter with Ms. Gilcrease on May 30, 2012].

(5) Ms. Epps had no history of refusing patient care, quite the contrary; yet, discipline was escalated for her in November 2012.

(6) Ms. Poff agreed Ms. Epps had the discretion to send the [soiled] patient to another department to get her taken care of quickly.

(7) Ms. Epps was placed on the termination list after Ms. White's review of her file.

(8) Ms. White was aware of Ms. Epps' FMLA status and she looked at Ms. Epps' FMLA records.

(9) FMLA status was looked at as a consideration in the July 201[3] terminations.

(10) The reasons given by Vanderbilt for Ms. Epps's termination was that its "workforce must be fully engaged to meet all performance expectations" and it was terminating "low performers."

(Docket Entry 80, p. 13-14) (citations omitted).

The temporal proximity of the Plaintiff's FMLA leave, the Plaintiff's discipline, and the Plaintiff's ultimate termination satisfies the causation element of the prima facie case for FMLA retaliation. Ms. Poff was notified when employees used FMLA leave and was aware of the Plaintiff's FMLA in 2012 and 2013. (Docket Entry 77-6, p. 18) (Docket Entry 86, p. 17). The Plaintiff took the following FMLA leave at the beginning of 2012: one day in January, seven days in February, one day in March, and three days in April. (Docket Entry 78-1, p. 67-69). The "Fuck you" incident with Ms. Gilcrease occurred on May 30, 2012. The Plaintiff took FMLA on

13

June 6 and 8, 2012. (Docket Entry 78-1, p. 70). Ms. Poff issued a PAC to the Plaintiff for the "Fuck you" incident on June 22, 2012. The Plaintiff then took FMLA on June 26, August 10, September 18, 19, and 21, and October 5, 2012. (Docket Entry 78-1, p. 70-72). The soiled patient incident occurred on November 9, 2012. The Plaintiff was disciplined for that incident on November 16, 2012. Next, the Plaintiff took FMLA on November 27, 2012, January 25, 29, 30, February 5, 6, 8, 12, 13, 15, 19, 20, 22, 26, 27, March 1, May 14, and June 18, 2013. (Docket Entry 78-1, p. 73-77). The Plaintiff was terminated on July 1, 2013. (Docket Entry 78-1, p. 61). The Plaintiff's FMLA leave in 2012 and 2013 is interspersed between the disciplinary incidents in 2012 as well as the Plaintiff's termination in 2013. The short lapses of time between the Plaintiff's protected FMLA conduct and the adverse employment actions fits comfortably within Sixth Circuit precedent which has held that a three-month delay is sufficient. *See Dye*, 702 F.3d at 306; *Seeger*, 681 F.3d at 283; *Bryson*, 498 F.3d at 571. The Plaintiff has established the causal element of the prima facie case.

Moving on, the Defendant has satisfied its burden of articulating a legitimate, nondiscriminatory reason for disciplining the Plaintiff and terminating the Plaintiff. The Plaintiff was disciplined for unprofessional conduct when she swore at a fellow employee and when she sent a soiled patient to the recovery room. Subsequently, the Plaintiff was allegedly terminated because of her disciplinary history. (Docket Entry 69, p. 14-15). Poor work performance is a legitimate and nondiscriminatory reason for taking an adverse employment action. *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 546 (6th Cir. 2008). The Defendant's burden is satisfied.

A bigger issue is whether the Defendant's reasons for disciplining and terminating the Plaintiff are pretextual. Temporal proximity, on its own, is not sufficient to establish pretext.

14

*Seeger*, 681 F.3d at 285. "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact;[2] (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Id.* These are not rigid categories. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Ultimately, the question is whether the employer acted for the stated reason or whether the stated reason is false and conceals unlawful discrimination. *Id.* (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). To survive summary judgment, the plaintiff must submit "evidence from which a jury could reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400 n.4.

The circumstantial evidence submitted to establish pretext, combined with the temporal proximity addressed earlier, is sufficient to survive summary judgment. Of note is the severity of the disciplinary actions and the parties' disagreement regarding the common usage of foul language in the workplace and nurses' discretion in patient care. These are factual disputes best left for a jury. If, as the Plaintiff contends, foul language was used regularly in the workplace and other employees were not disciplined for such conduct, the Defendant's motivation for issuing the Plaintiff a PAC for the "Fuck you" incident is called into question. Ms. Lewis testified that the "OR" can be a high stress environment, employees sometimes use profanity in the OR, and the only person she could recall being written up for profanity in the OR was the Plaintiff. (Docket Entry 77-4, p. 19). Though the Defendant draws a distinction between swearing in the OR and swearing in the endoscopy room (Docket Entry 87, p. 5), there still remains the question of whether another employee would have been disciplined for the same conduct. Similarly, with regard to the November 2012 "soiled patient" incident, there is a question as to the Plaintiff's ability to clean a soiled patient when certain supplies were lacking as well as whether the

---

[2] As the Defendant noted, a claim that the employer's legitimate, nondiscriminatory reason for acting has no basis in fact may be rebutted by the "honest belief rule." *Seeger*, 681 F.3d at 285.

Plaintiff had the discretion to send the soiled patient to the recovery wing. Curiously, a VERITAS filed on the same days as the "soiled patient" incident discusses another patient who had soiled herself in the OR but was not cleaned until later because the nurse did not have access to water in the OR. (Docket Entry 78-4). This VERITAS form does not mention the Plaintiff; other nurses were involved. (Docket Entry 78-4). It is unknown whether these nurses were disciplined for this conduct as well. The severity of the November 2012 Final Warning is important, since this disciplinary action placed the Plaintiff within the termination criteria. Additionally, the Plaintiff was added to the termination list shortly after an email was sent from Ms. Grant to Ms. Echols and Ms. Muscato saying "How many are out on FMLA?" Whether this was due to a coincidental delay in filing the Plaintiff's Final Warning in the human resources database, or whether employees' FMLA usage affected their employment status, the fact is in dispute. The Plaintiff has satisfied her burden of setting forth evidence that undermines the Defendant's articulated reasons for disciplining and terminating the Plaintiff. This is all that is required to survive a motion for summary judgment. The Defendant's request for summary judgment on the Plaintiff's FMLA retaliation claim should be **DENIED**.

**D.  Back Pay and Front Pay**

The Defendant next requests that the Plaintiff's claims for back pay and front pay be dismissed in light of the Plaintiff's representations to the Social Security Administration that she is too disabled to work. (Docket Entry 69, p. 17). The Plaintiff did not respond to the Defendant's motion in this regard.

The United States Supreme Court addressed a similar issue when a SSDI recipient pursued a claim of disability discrimination under the ADA. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999). The Supreme Court concluded that receipt of SSDI (1) did not

estop the plaintiff from pursuing an ADA claim and (2) did not erect a strong presumption against the plaintiff's ADA claim. *Id.* at 797-98. However, since a recipient of SSDI has represented that she is too disabled to work, to survive summary judgment the plaintiff would need to explain how her claims for SSDI were consistent with her ADA claims that she could "perform the essential functions" of the job with reasonable accommodation. *Id.* at 798. Claims for SSDI, the Court noted, do not address whether an applicant can work with reasonable accommodation. *Id.* at 803. The Court further emphasized that an unsuccessful applicant for SSDI who has also raised an ADA claim is a prime example of our legal system's acceptance of inconsistent, competing legal theories. *Id.* at 805. The Sixth Circuit recently reaffirmed this principle, stating "[n]either application for nor receipt of social security disability benefits is by itself conclusive evidence that an individual is completely incapable of working." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 429 (6th Cir. 2014). The *Cleveland* rationale has been applied to competing claims for SSDI benefits and claims under the FMLA. *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 498 (6th Cir. 2008); *McDonald v. Mt. Perry Foods, Inc.*, No. C2:09-CV-0779, 2011 WL 3321470, at *11 (S.D. Ohio Aug. 2, 2011).

The Plaintiff testified that during the last year of her employment her physical condition did not impact her ability to deal with patients and doctors or negatively impact her work performance in any other facet. (Docket Entry 70-1, p. 12). She did, however, apply for SSDI in January 2013, listing an onset date of disability as January 23, 2013. (Docket Entry 70-3, p. 11, 21-22). The Plaintiff explained that she was very ill at that point in time, stating that she was out sick during February 2013. (Docket Entry 70-3, p. 11). She also stated "[t]he writing was on the wall, and I knew I was going to be fired, and I knew -- I had been looking for work for nine

months, and I was -- nobody was going to hire me, and I was sick." (Docket Entry 77-3, p. 14). Ultimately, the Plaintiff did not pursue this SSDI application. (Docket Entry 77-1, p. 29).

The Plaintiff filed a second application for SSDI benefits in January 2014, alleging July 2, 2013 as the onset date of disability. (Docket Entry 77-3, p. 2-3). That application has been denied. (Docket Entry 77-3, p. 3-4). When asked why she chose that particular onset date, the Plaintiff explained that she had sought out work but had not been able to find any and listed July 2, 2013 because that had been her last day of work. (Docket Entry 77-3, p. 3-4). When asked whether she could adjust to other work despite her medical conditions, the Plaintiff stated she could not at the time of the deposition in August 2015 but that she could have continued working as a floor nurse or as a circulator in July 2013. (Docket Entry 77-3, p. 5). After being terminated in July 2013, the Plaintiff unsuccessfully sought employment with doctor's offices and health agencies. (Docket Entry 77-3, p. 5). She stated she would not feel comfortable returning to work as a nurse as of January 2014. (Docket Entry 77-3, p. 24). The Defendant sought to clarify the discrepancy between the Plaintiff's statements to the Social Security Administration and her deposition testimony in the following:

> Q. Do you have any explanation for why you told the Social Security Administration that you couldn't do the work that you did before and you couldn't adjust to other work because of your medical conditions? Do you have any --
>
> A. I don't know, because --
>
> Q. Do you have an explanation for that?
>
> A. I don't. No, I don't.
>
> Q. Okay --
>
> A. I know I tried to find work, and I couldn't.
>
> Q. Yes, ma'am, and we'll get to that --

18

>
> A. And I'm sure it had --
>
> Q. -- in a little bit.
>
> A. -- a lot to do with my attendance and my health.
>
> Q. Right. That's not what I'm asking. I'm asking about whether you have an explanation for you telling social security you couldn't work and you telling me now that you could?
>
> A. Well, my supervisors at Vanderbilt told me I wasn't up to par, and they fired me. So they made the decision that I wasn't, but I thought I was. And they didn't offer any encouragement, or talk to me in any way, or help me, or even ask me what was wrong.

(Docket Entry 77-3, p. 5-6).

As it stands, the Plaintiff has applied for, but has not received SSDI benefits. At the time her employment ended, she believed she could still work as a floor nurse or as a circulator. When asked to explain why she filed for disability benefits, the Plaintiff responded that she thought she was going to be fired and that had been unable to find another job. Addressing her difficulty in obtaining a new job, the Plaintiff suspected that this was due to her attendance record and her health. The Plaintiff rather obliquely suggested in her deposition that she could have continued working for the Defendant had she been accommodated. Although the Plaintiff agreed that she could no longer work as a nurse as of January 2014, that does not account for whether she could have worked as a nurse between July 2013 and January 2014. Whether the Plaintiff was capable of working with or without reasonable accommodation at the time she was terminated in July 2013 is in genuine dispute. Thus, the issue of back pay and front pay is properly left to the finder of fact. The Defendant's request for summary judgment on the Plaintiff's demand for back pay and front pay should be **DENIED**.

## V.     Recommendation

The Magistrate Judge **RECOMMENDS** that the Defendant's Motion for Summary Judgment be **GRANTED IN PART and DENIED IN PART**. The Defendant's Motion for Summary Judgment should be **GRANTED** as to the Plaintiff's claims of age discrimination and disability discrimination. The Defendant's Motion for Summary Judgment should be **DENIED** as to the Plaintiff's claim of FMLA retaliation and the Plaintiff's demand for back pay and front pay.

Under Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days, after being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 11th day of February, 2016.

/s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge